**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

**Civil Action No. 13-cv-01421-MSK-BNB**

**JESUS ESPINOZA, JR.,**

    **Plaintiff,**

**v.**

**ARKANSAS VALLEY ADVENTURES, LLC;**

    **Defendant.**

___

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
___

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment (**# 17**), the Plaintiff's Response (**# 22**), and the Defendant's Reply (**# 26**).

**I.    JURISDICTION AND ISSUES PRESENTED**

Sue Ann Apolinar died on a white water rafting trip conducted by Defendant Arkansas Valley Adventures ("AVA"). This action is brought by Ms. Apolinar's son, Jesus Espinoza, who asserts three claims related to his mother's death: (1) negligent, careless, and imprudent operation of a raft resulting in wrongful death; (2) negligence and negligence per se; and (3) fraud and misrepresentation.

AVA moves for summary judgment on all three claims. It seeks to dismiss any "survivorship" claim premised on C.R.S. § 13-20-101 for lack of capacity. In addition, it seeks judgment in its favor on all of Plaintiff's claims based on its affirmative defense that Ms. Apolinar released AVA from liability and assumed all risks prior to the rafting trip. The Court exercises jurisdiction pursuant to 28 U.S.C. 1332. The issues are governed by Colorado law.

1

## II. MATERIAL FACTS

Based upon the evidence submitted by the parties, which the Court construes most favorably to the Plaintiff, the material facts are summarized below. Where appropriate, the Court provides further explication explication in conjunction with its analysis.

Mr. Espinoza is Ms. Apolinar's son. There is no evidence of record that an estate was created following Ms. Apolinar's death or whether Mr. Espinoza acts in a fiduciary capacity for such estate.

AVA is a river outfitter licensed under C.R.S. § 33-32-104. It offers a number of river rafting trips of varying levels of difficulty. Among the trips it offers is "24 Hours in Brown's Canyon," which Ms. Apolinar booked based on her review of AVA's website. She made reservations for herself, her significant other, her god-daughter, and Mr. Espinoza because "it looked like fun and was appropriate for [the group's] level of experience."

Before beginning the rafting trip, AVA required its participants to review and execute a document entitled "Rafting Warning, Assumption of Risk, and Release of Liability & Indemnification Agreement" ("Agreement"). Ms. Apolinar signed the Agreement for herself and for her minor son, Mr. Espinoza, on June 7, 2011 before beginning the trip.

On the second day of the trip, the raft carrying Ms. Apolinar capsized while navigating a rapid known as "Seidel's Suck Hole." Ms. Apolinar was ejected from the raft. An AVA guide pulled her back into the raft, but it capsized and ejected Ms. Apolinar, again. Ms. Apolinar was swept into a logjam, became entangled with the collection of tree logs and branches, and tragically drowned.

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser–Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed.R.Civ.P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward,* 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material

fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

## IV.   ANALYSIS

AVA's motion raises a straight forward issue – are Ms. Espinoza's claims barred by the exculpatory and release provisions of the Agreement executed by Ms. Apolinar.  However, before addressing that question, AVA asks that the Court clarify the capacity in which Mr. Espinoza brings this action.

### A.   **Capacity**

As noted, Mr. Espinoza asserted three claims in the Amended Complaint: (1) negligent, careless, and imprudent operation of a raft resulting in wrongful death; (2) negligence and negligence per se; and (3) fraud and misrepresentation.  None of these are brought for injuries to Mr. Espinoza[1], only for the death of his mother.

Colorado law recognizes that claims can be brought on behalf of a decedent in two different capacities.  The first type of claim is brought in a fiduciary capacity by the personal representative of the estate of the deceased person. C.R.S. § 13-20-101.  Claims brought in this capacity are often referred to as "survival" claims.  The personal representative "stands in the decedent's shoes" in order to assert a claim that the decedent could have asserted had he or she been alive.  The beneficiary of a survival claim is the decedent's estate.

The second type of claim is brought by the decedent's heir.  Known as a wrongful death claim, it is created and limited by statute. C.R.S. § 13-21-201 et seq; *see also Espinoza v. O'Dell*, 633 P.2d 455, 462-466 (Colo. 1981).  A wrongful death claim differs from a claim that a

---

[1] Much of the parties' argument addresses questions of Ms. Apolinar's capacity to execute the Agreement for her son (then a minor), Mr. Espinoza.  The Court need not address this debate because Mr. Espinoza is not asserting claims for injuries to him.  He asserts claims for the death of his mother, which grow out of what she could have asserted had she survived, and therefore it is the Agreement that she executed for herself that is at issue.

decedent could have asserted during his or her lifetime.  A wrongful death claim arises only upon the decedent's death, it addresses wrongful acts that caused the death, and the amount of recovery is limited by statute.  C.R.S. § 13-21-203; *Fish v. Liley,* 208 P.2d 930, 933 (1949); *Colorado Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156, 1164 n. 6 (Colo. 2000).  To prove a wrongful death claim, an heir must establish that (1) the death of the decedent; (2) was caused by a wrongful act and 3) that the decedent would have been able to maintain an action for injuries, had the person survived.  *Stamp v. Vail Corp.*, 172 P.3d 437, 451 (Colo. 2007).  A wrongful death claim is subject to the same limitations and defenses that would have applied to the claim had the decedent survived and brought the claim.  *Elgin v. Bartlett,* 994 P.2d 411, 416 (Colo.1999); *see also Lee v. Colo. Dep't of Health,* 718 P.2d 221, 233 (Colo.1986) ( comparative negligence of the decedent will reduce the recovery available in a wrongful death action brought by the decedent's heirs).

The Amended Complaint does not clearly identify in what capacity Mr. Espinoza asserts the claims in this action, but in the absence of the representation that a probate estate has been created for Ms. Apolinar and that Mr. Espinoza is the appointed executor or personal representative, the Court assumes that he brings this action for wrongful death of his mother. Thus, the three claims are merely alternate theories of alleged wrongful conduct leading to wrongful death.  With that clarification, the Court turns to AVA's affirmative defense.

**B. The Agreement**

AVA argues that it is entitled to judgment on Mr. Espinoza's wrongful death claim, regardless of the theory upon which it is premised, because Ms. Apolinar contractually released AVA from any claims and liability and assumed all risks associated with white water rafting.

These arguments are in the nature of affirmative defenses upon which AVA bears the burden of proof. *See Squires ex rel. Squires v. Goodwin*, 829 F.Supp 2d 1062, 1071 (D. Colo. 2011).

There is no dispute that prior to the raft trip, AVA presented and Ms. Apolinar executed a two-page Agreement that provides in pertinent part:

> **2. Risks of Activity.** The Undersigned agree and understand that taking part in the Activity can by HAZARDOUS AND INVOLVES THE RISK OF PHYSICAL INJURY AND/OR DEATH. The Undersigned acknowledge that the Activity is inherently dangerous and fully realize the dangers of participating in the Activity. The risks and dangers of the activity include, but are not limited to: choice of rafting course, . . . choice of outfitter, negligence of rafting or climbing or zip lining guides, changing weather conditions, changing water conditions, cold water immersion, hidden underwater obstacles, trees or other above water obstacles, . . . changing and unpredictable currents, drowning, exposure, swimming, overturning, . . . entrapment of feet or other body parts under rocks or other objects . . . . THE UNDERSIGNED ACKNOWLEDGE AND UNDERSTAND THAT THE DESCRIPTION OF THE RISKS LISTED ABOVE IS <u>NOT</u> COMPLETE AND THAT PARTICIPATING IN THE ACTIVITY MAY BE DANGEROUS AND MAY INCLUDE OTHER RISKS.
> **3. Release, Indemnification, and Assumption of Risk.** In consideration of the Participant being permitted to participate in the activity, the Undersigned agree as follows:
> (a) <u>Release.</u> THE UNDERSIGNED HEREBY IRREVOCABLY AND UNCONDITIONALLY RELEASE, FOREVER DISCHARGE, AND AGREE NOT TO SUE OR BRING ANY OTHER LEGAL ACTION AGAINST THE RELEASED PARTIES with respect to any and all claims and causes of action of any nature whether currently known or unknown, which the Undersigned or any of them, have or which could be asserted on behalf of the Undersigned in connection with the Participant's participation in the Activity, including, but not limited to claims of negligence, breach of warranty, and/or breach of contract.
> (b) <u>Indemnification.</u> The Undersigned hereby agree to indemnify, defend and hold harmless the Released Parties from and against any and all liability, cost, expense or damage of any kind or nature whatsoever and from any suits, claims or demands including legal fees and expenses whether or not in litigation, arising out of, or related to, Participant's participation in the Activity. Such obligation on the part of the Undersigned shall survive the period of the Participant's participation in the Activity.
> (c) <u>Assumption of Risk.</u> The Undersigned agree and understand that there are dangers and risks associated with participation in the Activity and that INJURIES AND/OR DEATH may result from participating in the Activity, including, but not limited to the acts, omissions, representations, carelessness, and negligence of the Released Parties. By signing this document, the Undersigned recognize that property loss, injury and death are all possible while participating

> in the Activity. RECOGNIZING THE RISKS AND DANGERS, THE UNDERSIGNED UNDERSTAND THE NATURE OF THE ACTIVITY AND VOLUNTARILY CHOOSE FOR PARTICIPANT TO PARTICIPATE IN AND EXPRESSLY ASSUME ALL RISKS AND DANGERS OF THE PARTICIPATION IN THE ACTIVITY, WHETHER OR NOT DESCRIBED ABOVE, KNOWN OR UNKNOWN, INHERENT, OR OTHERWISE.

As noted earlier, Mr. Espinoza's wrongful death claim is subject to the defenses that could have been asserted against Ms. Apolinar, had she lived and brought the claim. The issue is whether the exculpatory provision in Paragraph 3(a) or the assumption of risk provision in Paragraphs 2 and 3(c) of the Agreement would have barred Ms. Apolinar's claims. If so, Mr. Espinoza's wrongful death claim is similarly barred.

The Court begins with the exculpatory provision of the Agreement. Colorado law favors enforcement of contracts, but exculpatory provisions that shield one party from its future negligence must be carefully scrutinized.[2] Whether an exculpatory provision is enforceable is a question of law. In order to determine whether an exculpatory clause is enforceable, courts evaluate the four "Jones factors"[3]: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language."

1. **Duty to the Public**

This factor focuses on whether the party seeking to enforce the contract (here, AVA) provided such a necessary and important service to the public that the releasing party (Ms.

---

[2] Indeed, there are some types of conduct for which exculpatory clauses are never enforceable. For example, they cannot be used as a shield against a claim for willful and wonton negligence. *See, e.g.*, *Chadwick v. Colt Ross Outfitters, Inc.,* 100 P.3d 465, 467 (Colo.2004); *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981); *Barker v. Colorado Region*, 532 P. 2d 372 (1974).

[3] These come from *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). Although colloquially referred to as "factors," they really are not treated as such – they are not weighed, compared or tallied. Instead, they might be better understood as situations in which an exculpatory clause should not be enforced.

Apolinar) could not reasonably be expected to refuse the service in order to avoid the exculpatory provision. Drawing from *Tunkl v. Regents of University of California*, 383 P.2d 441, 444 (1963), Colorado law recognizes that when a service has great importance to the public and it is a matter of practical necessity to some members of the public, then the provider of the service has undue bargaining power in setting the terms of the contract. In such case, an exculpatory agreement may be void as an adhesion contract. *See Jones*, 623 P. 2d at 376; *Potter v. Nat'l Handicapped Sports*, 849 F. Supp. 1407, 1409 (D. Colo. 1994).

By their nature, recreational activities generally are not considered necessary public services. Instead, participation in these activities is optional. *See, e.g.*, *Chadwick*, 100 P.3d at 467; *Mincing v. Vail Holdings, Inc.*, 308 F.3d 1105, 1110 (10th Cir. 2002); *Potter*, 849 F. Supp. at 1409. Indeed, at least one court has specifically found that white water rafting activities are not necessary public services. *See Lahey v. Covington*, 964 F. Supp. 1440, 1445 (D. Colo 1996).

Mr. Espinoza does not dispute this authority. Instead, he argues that because white water rafting is regulated by Colorado statute, it has a public aspect[4], and that enforcement of the exculpatory clause in the Agreement would frustrate the purposes of regulation. Mr. Espinoza is quite correct that white water rafting enterprises are regulated under the Colorado River Outfitter's Act (CROA), C.R.S. § 33-32-101 et seq. CROA makes it "unlawful any river outfitter, guide, trip leader, or guide instructor to (i) violate CROA's safety equipment provisions; (ii) operate a vessel in a careless or imprudent manner without due regard for river conditions or other attending circumstances, or in such a manner as to endanger any person, property, or wildlife; or (iii) operate a vessel with wanton or willful disregard for the safety of

---

[4] Presumably, this argument is based on a sentence found in *Tunkl*'s explanation of the types of services that might create public duties: "It concerns a business of a type generally thought suitable for public regulation." *Tunkl*, 383 P2d at 444.

persons or property. An outfitter or guide that does not comply with CROA's safety obligations commits a misdemeanor. § 33-32-107.

The regulation of white-water rafting enterprises, however, does not change the nature of the service that AVA provides. White water rafting is a purely recreational activity, as compared to an essential or necessary one. The rafter is free to decline the service if the rafter is unwilling to accept the terms of the exculpatory clause. Indeed, since CROA was enacted, several courts have enforced exculpatory agreements protecting white water rafting operators. *See Lahey*, 964 F. Supp. at 1446; *Forman v. Brown*, 944 P2d 559, 563-64 (Colo. App. 1996).

Furthermore, enforcement of the exculpatory provision does not logically or practically have any impact on regulation under CROA. There is Colorado authority that recognizes that when a statute defines the scope of civil liability, individuals cannot contract around it; however, such authority is not instructive here.

In *Stanley v. Creighton Co.*, 911 P.2d 705, 708 (Colo. App. 1996)*,* the Colorado Court of Appeals compared the provision of the Colorado Premises Liability Act that made a landowner liable to invitees for damages caused by the "landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known"[5] with conflicting exculpatory language in a lease, "Lessor shall not be responsible for any damage or injury said Lessee may sustain from any cause whatsoever unless injury is a direct result of the Lessor's gross negligence." The Court characterized the issue of the validity of the lease's exculpatory clause as implicating competing principles: freedom of contract and responsibility for damages caused by one's own negligent acts. *Stanley*, at 706 (citing *Hail Valley Ranch, Inc.*

---

[5] C.R.S. §13-21-115(3)(c)(I).

9

*v. Simkin,* 784 P.2d 781 (Colo.1989)). Ultimately, it held that where the General Assembly has expressed its intent in an area of clear public policy, a contract to the contrary is invalid.

However, the *Stanley*-type situation is not present here. CROA does not address the scope of civil liability of rafting operators.[6] Rather, it provides for the creation of safety standards that are enforceable by criminal penalty. *See* C.R.S. §§ 33-32-107,108. If the exculpatory provision of the Agreement were to bar Mr. Espinoza's wrongful death claim, Colorado nevertheless could implement its public policy under CROA by prosecuting and punishing AWA under the CROA safety standards. In fact, the record reflects that CROA enforcement occurred in this case. The Colorado State Parks ("CSP") conducted an investigation, and found that all required safety equipment was on the trip, all equipment to was in serviceable condition, and all of the guides were qualified as required by Colorado law. CSP concluded that other than filing a late written report that there were "[n]o other violations of Colorado law".

Because rafting is not a necessary, public service and its regulation is unaffected by the terms of the exculpatory provision, this factor does not compel a determination of unenforceability.

---

[6] In this respect, CROA differs from the statutory schemes in other states cited by Mr. Espinoza in his Response to the Motion for Summary Judgment because those statutes establish the limits on civil liability for recreational outfitters, rather than a public right enforced through criminal penalties. *See* W. Va. Code Ann. § 20-3B-5 (West) ("No licensed commercial whitewater outfitter or commercial whitewater guide acting in the course of his employment is liable to a participant for damages or injuries to such participant unless such damage or injury was directly caused by failure of the commercial whitewater outfitter or commercial whitewater guide to comply with duties placed on him by [statute or rule]."); Idaho Code Ann. § 6-1206 (West) ("No licensed outfitter or guide acting in the course of his employment shall be liable to a participant for damages or injuries to such participant unless such damage or injury was directly or proximately caused by failure of the outfitter or guide to comply with the duties placed on him by [statute or rule].").

### 2. Nature of Service Performed

Somewhat duplicative of the first factor, the second concerns the nature of the service that was performed. An exculpatory provision can be invalidated when "the activity can be described as an essential service." *See Lahey*, 964 F.Supp. at 1445. The parties agree that white-water rafting is not an essential service. Thus, this factor does not invalidate the exculpatory provision in the Agreement.

### 3. Whether the Agreement was Fairly Entered Into

The third factor focuses on whether the party benefitted by the exculpatory clause overreached the releasing party. Colorado law specifies that a contract is "fairly entered into" if neither party is so obviously disadvantaged with respect to bargaining power that he/she is placed at the mercy of the other party's negligence." *Hamill v. Cheley Colorado Camps, Inc.*, 262 P.3d 945, 949 (Colo. App. 2011). Simply because a contract is on a printed form and is offered on a "take-it-or-leave-it basis" does not necessarily make it unfair, especially when similar services can be obtained by another provider. *See Jones*, 623 P.2d at 375; *Mincin*, 308 F.3d at 1111; *Hamill*, 262 P.3d at 949. Analysis with regard to this factor turns on the particular facts surrounding the execution of the Agreement.

Mr. Espinoza argues that AVA defrauded Ms. Apolinar at the time she selected and reserved seats for the rafting trip. He contends that on its website, AVA misrepresented that the trip was for beginners and was safe for families on its website. In particular, he contends that AVA represented that this trip included no rapids rated higher than Class III rapids, when in reality one rapid known as Seidel's Suck Hole was a Class IV rapid. He states that had Ms. Apolinar known that Seidel's Suck Hole was a Class IV rapid, she would not have selected the particular rafting trip, participated in the trip or signed the Agreement.

The Court recognizes that there is a genuine dispute as to the difficulty level of Seidel's Suck Hole and assumes that it was a Class IV rapid for purposes of this motion. The Court further assumes that AVA did not disclose the severity of the rapid to Ms. Apolinar on its website or later when Ms. Apolinar signed the Agreement. The nature of the omitted information (severity of the rapid) arguably was material to questions of risk of injury or death. Even if viewed as misrepresentation by omission (failure to disclose Seidel's Suck Hole as a class IV rapid) or false representation (that Seidel's Suck Hole was a Class III rapid), there is no evidence that suggests that Ms. Apolinar relied on such designation in executing the Agreement.

The chronology of events shows two independent decisions by Ms. Apolinar. She viewed the website and booked the trip online before traveling to Colorado. But, Ms. Apolinar executed the Agreement after she arrived in Colorado before the trip began. There is no evidence in the record addressing the manner in which the Agreement was presented to Ms. Apolinar or any representations made to her by AVA before or at the time of its execution. There is no evidence, for example, that an AVA employee told Ms. Apolinar that the Agreement or release language was not important, was not accurate, would not be enforced, or did not mean what it said.

Turning to the Agreement, it both applied to all rafting trips (not just the one Ms. Apolinar had chosen) and it described the risks in the contexts of all rafting activity. It characterizes all rafting activity as "HAZARDOUS AND INVOLVES THE RISK OF PHYSICAL INJURY AND/OR DEATH" and it states that there are particular risks and dangers that cannot be anticipated including changing water conditions, obstacles, currents, etc. In capitalized print, it states that "THE UNDERSIGNED ACKNOWLEDGE AND UNDERSTAND THAT THE DESCRIPTION OF THE RISKS LISTED ABOVE IS <u>NOT</u>

12

COMPLETE AND THAT PARTICIPATING IN THE ACTIVITY MAY BE DANGEROUS AND MAY INCLUDE OTHER RISKS". It also contains an integration and merger clause. Paragraph (6)(c) states that the Agreement's representations "supersede prior contracts, arrangements, communications or representations, whether oral or written, between the parties relating to the subject matter hereof."

Assuming that AVA's website portrayed, and Ms. Apolinar believed, that the rafting trip she booked was safe for families before participating, she was presented with an Agreement that contained comprehensive, even dire, descriptions of the risks she was undertaking. There is no evidence that Ms. Apolinar relied on the website information in lieu of the risks outlined in the Agreement at the time she signed the Agreement, nor any evidence that she was misled or overreached by AVA employees. Faced with stark representations of risk in the Agreement, Ms. Apolinar could have cancelled her reservation and declined to participate in the rafting trip. Thus, the Court finds that Ms. Apolinar fairly entered into the Agreement. On this record, the Court cannot find that she was either overreached or defrauded. *See Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 879 (10th Cir. 2013) ("Plaintiff has failed to provide any evidence that [her mother] relied on this misrepresentation in deciding to sign the Release.").

### 4. Whether the Agreement is Clear and Unambiguous

The final "Jones factor" asks whether the exculpatory provision was clear and unambiguous. To evaluate this factor, a court "examine[s] the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions." *See Chadwick*, 100 P.3d at 467.

Mr. Espinoza argues that Agreement is not clear and unambiguous because it is broad, unduly long, and obscures the key terms. The Court disagrees.

First, at less than two pages, the Agreement "is not inordinately long or complicated." *See Brooks v. Timberline Tours, Inc.*, 127 F.3d 1273, 1275 (10th Cir. 1997); *Lahey*, 964 F. Supp. at 1445 (concluding that a release agreement of "just over one page" was "short").

Second, the Agreement repeatedly and clearly states that the signor is releasing AVA from liability. The title of the document is "RAFTING WARNING, ASSUMPTION OF RISK, RELEASE OF LIABILITY AND INDEMNIFICATION AGREEMENT". This is immediately followed by a directive, "PLEASE READ CAREFULLY BEFORE SIGNING. THIS IS A RELEASE OF LIABILITY & WAIVER OF LEGAL RIGHTS."

The body of the Agreement contains six main paragraphs titled in boldface print. For example: **2. Risks of Activity**" and " **3. Release, Indemnification and Assumption of Risk.**" Key portions are printed in all capital letters. For example, the "Release" clause indicates the signor's agreement to "THE UNDERSIGNED HEREBY IRREVOCABLY AND UNCONDITIONALLY RELEASE, FOREVER DISCHARGE , AND AGREE NOT TO SUE OR BRING ANY OTHER LEGAL ACTION AGAINST THE RELEASED PARTIES with respect to any and all claims and causes of action of any nature whether currently known or unknown, which the undersigned of any of them have or which could be asserted on behalf of the Undersigned in connection with the Participant's participation in the Activity." There is no legal jargon that impairs the meaning of this or other provisions.

Third, the Agreement clearly expresses intent for the release to apply to claims based on injury or death resulting from white water rafter, including the type of circumstances that led to Ms. Apolinar's death. It expressly states there is a risk of physical injury or death and lists specific risks such as "trees or other above water obstacles," drowning, overturning, and "entrapment of feet or other body parts under rocks or other objects." The Court finds that the

Agreement clearly and unambiguously articulates the intent of the parties to release AVA from all liability resulting from Ms. Apolinar's participation in the rafting trip.

As explained above, none of the Jones factors compels a finding that the Agreement's exculpatory clause is invalid. Thus, as a matter of law, the exculpatory clause would have barred claims for injury to Ms. Apolinar, had she survived. Similarly, it bars wrongful death claims by Mr. Espinoza as her heir. C.R.S. § 13–21–202; *see also Rowan v. Vail Holdings, Inc.*, 31 F.Supp.2d 889, 895 (D. Colo. 1998) ("Colorado courts interpreting the statute hold, consistent with the plain language of the statute, that the right to bring a wrongful death claim is dependent on the decedent's ability to have brought the claim."). Because this action is barred, it is not necessary to address the parties' arguments as to the Agreement's assumption of risk provisions. As a matter of law, AVA is entitled to dismissal of all claims with prejudice.

**IT IS HEREBY ORDERED** that AVA's Motion for Summary Judgment (**#17**) is **GRANTED**. AVA is entitled to judgment on its affirmative defense as against all claims of the Plaintiff. The Clerk shall enter judgment in favor of the Defendant and against the Plaintiff on all claims and close this case.

Dated this 26th day of September, 2014.

BY THE COURT:

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge